STATE OF OHIO



DEPARTMENT OF REHABILITATION
AND CORRECTION

| SUBJECT: **Execution** | PAGE ___1___ OF __11__ |
| --- | --- |
| | NUMBER: 01-COM-11 |
| RULE/CODE REFERENCE:<br>ORC 2949.22; 2949.25 | SUPERSEDES:<br><br>01-COM-11 dated 05/14/2009 |
| RELATED ACA STANDARDS: | EFFECTIVE DATE:<br><br>November 30, 2009 |
| | APPROVED:<br><br>_Terry J Collins_ |

## I.   AUTHORITY

This policy is issued in compliance with Ohio Revised Code 5120.01 which delegates to the Director of the Ohio Department of Rehabilitation and Correction the authority to manage and direct the total operations of the Department and to establish such rules and regulations as the Director prescribes.

## II.   PURPOSE

The purpose of this policy is to establish guidelines for carrying out a court-ordered sentence of death.

## III.   APPLICABILITY

This policy applies to all individuals involved in carrying out a court-ordered death sentence in accordance with all applicable policies, administrative regulations and statutes.

## IV.   DEFINITIONS

**Critical Incident Debriefing Team** - A group selected by the SOCF Warden, and including the Religious Services Administrator available to assist any persons involved in the execution process. A psychological debriefing process is available via DRC clinical staff and others to recognize stressors associated with executions and to work through them with affected staff as follows:

- Worker's own experiences of the execution including reactions and perceptions.
- Review any negative aspects and feelings.
- Review any positive aspects and feelings.
- Relationships with workers and/or family.
- Empathy (sharing) with others.
- Disengagement from execution experience.
- Integration of this experience into the professional work role for a positive future contribution to the overall team effort.
- Exploring Religious Convictions and feelings.

**Death Row** – (1) A housing area at OSP that has been designated by the Director of the Department of Rehabilitation and Correction to house male inmates who are committed to the Department with a sentence of death; (2) a housing area at ORW that is similarly designated to house female inmates

EXHIBIT
tabbies
A

| SUBJECT:  Execution | PAGE   2    OF   11 |
| --- | --- |

committed to the Department with a sentence of death; (3) A housing area at MANCI that has been designated by the Director of the Department of Rehabilitation and Correction to house male inmates who are committed to the Department with a sentence of death who are determined to be seriously mentally ill pursuant to the criteria set forth in Department Policy 67-MNH-27, Transfer of Offenders to the Ohio State Penitentiary, or whose medical needs are inconsistent with assignment to OSP pursuant to Department Policy 68-MED-13, Medical Classification. Death Row is also a reference to a housing status for inmates sentenced to death; it is not a security classification.

**Execution Team** - A team consisting of no less than twelve (12) members, designated by the Warden of the Southern Ohio Correctional Facility (SOCF) and the Religious Services Administrator.  Their duties also include preparation and testing of equipment, carrying out pre- and post-execution activities, and counseling with the inmate.

**Lethal Injection** - The application to the person, upon whom the sentence was imposed, of a lethal injection of a drug or combination of drugs of sufficient dosage to quickly and painlessly cause death. The application of the drug or combination of drugs shall be continued until the person is dead.

**Reprieve** - The postponement of an execution.

**Stay** - A court-ordered suspension or postponement of a legal execution.

V. **POLICY**

It is the policy of the Ohio Department of Rehabilitation and Correction to carry out the death penalty as directed by Ohio Courts of Law.  All execution processes shall be performed in a professional, humane, sensitive, and dignified manner. It is the responsibility of the Director to designate a penal institution where death sentences shall be executed.  The Warden of that facility, or Deputy Warden in the absence of the Warden, is responsible for carrying out the death sentence on the date established by the Ohio Supreme Court.

VI. **PROCEDURES**

A. **General Guidelines**

1. All offenders sentenced to death by a court of law will be transported to a reception center within the Ohio Department of Rehabilitation and Correction for initial processing. Upon completion of the reception process the offender will immediately be transferred to the designated institution:  Mansfield Correctional Institution (MANCI) or Ohio State Penitentiary (OSP) for male offenders or Ohio Reformatory for Women (ORW) for female offenders.

2. All court-ordered executions shall be carried out at the Southern Ohio Correctional Facility (SOCF) at 10:00 a.m. on the scheduled execution date.

3. Unless otherwise designated by the Director/designee, the condemned inmate will remain on death row until transferred to the Death House at SOCF for scheduled execution.

DRC 1362

4.  The Ohio Supreme Court shall designate the date of execution.  Upon receipt of a scheduled execution date, the Warden of the institution housing the inmate shall notify the Director, the Religious Services Administrator, and the SOCF Warden.

5.  Attendance at the execution is governed by the Ohio Revised Code, section 2949.25 and includes:

    a.  The Warden or Acting Warden of the institution where the execution is to be conducted, and such number of correction officers or other persons as the Warden or Acting Warden thinks necessary to carry out the death sentence.
    b.  The Sheriff of the county in which the prisoner was tried and convicted.
    c.  The Director of the Department of Rehabilitation and Correction, or designee and any other person selected by the Director/designee to ensure that the death sentence is carried out.
    d.  Such number of physicians of the institution where the execution is to be conducted and medical personnel as the Warden or Acting Warden thinks necessary.
    e.  The prisoner may select one of the following persons: the Religious Services Administrator, minister-of-record, clergy, rabbi, priest, imam, or regularly ordained, accredited, or licensed minister of an established and legally cognizable church, denomination or sect, subject to the approval of the Warden.
    f.  Three persons designated by the prisoner who are not confined in any state institution subject to the approval of the Warden or Acting Warden based on security considerations.
    g.  Three persons designated by the immediate family of the victim, subject to the approval of the Warden or Acting Warden based on security considerations, as detailed in Department Policy 03-OVS-06, Victim Involvement in the Execution Process.
    h.  Representatives of the news media as the Director/designee authorize which shall include at least one representative of the following: a newspaper, a television station, and a radio station.

6.  The SOCF Warden shall establish procedures for conducting executions consistent with all applicable laws, administrative codes, and DRC policies. This will include the establishment of a communication system between the Governor's Office and the SOCF Command Center.

    a.  Primary communications will be via a telephone line opened directly to the SOCF Command Center from the execution chamber.  This line will be tested one (1) hour prior to the scheduled execution.  Other than testing, this line will remain open.
    b.  Secondary communications will be via cellular telephone.
    c.  In the event that both the primary and secondary communications are inoperable, the execution will be delayed until communications are established.

B.  **Execution Procedures**

1.  Approximately thirty (30) days prior to the scheduled execution date:

    a.  The Managing Officer of the institution where the inmate is housed will notify the Director by memo, with copies going to the Regional Director, DRC Chief Counsel,

DRC 1362

| SUBJECT: Execution | PAGE____4____ OF __11__ |
|---|---|

Assistant Director, APA, Ohio State Highway Patrol (Portsmouth and Jackson), and the Office of Victim Services.

b.  The SOCF Execution Team will begin conducting training sessions no less than once per week until the scheduled date of execution.  Training in the following topics will be provided for every member of the execution team prior to service and at least once per year thereafter:

    i.  the general nature and effects of the drugs that are used during the execution process,

    ii.  medication administration procedures, including the insertion of the IV needles and administration of intramuscular injections,

    iii.  signs or symptoms of problems when administering medications, and

    iv.  any legal developments of significance.

c.  The Religious Services Administrator (RSA) shall make contact with the inmate to establish counseling and family contact information.

d.  Prior to commencement of the initial training session, the Warden or the team leader will verify and document that the execution team includes persons who are currently qualified under Ohio Law to administer and prepare drugs for intravenous and intramuscular injections, and that the persons have at least one year experience as a certified medical assistant, phlebotomist, EMT, paramedic or military corpsman.  Medical team members shall provide evidence of certification status at least once per year and upon any change in status.

e.  All persons assigned to the execution team will be provided with a copy of this policy directive, to include subsequent revisions, and shall sign for its receipt.

2.  Approximately seven (7) days prior to the execution:

a.  The Managing Officer of the institution where the inmate is housed will have the Execution Information Release (DRC1808) completed by the condemned prisoner.  This information will verify information on the condemned prisoner, visitors, witnesses, spiritual advisor, attorney, requested witness, property, and funeral arrangements.

b.  The names of official witnesses/media witnesses will be supplied to the SOCF Warden, as outlined in this policy.

c.  The names and relationships of the victim's witnesses will be supplied to the SOCF Warden.

d.  The RSA will provide family information from the inmate to the Warden at SOCF.

3.  Approximately twenty-four (24) hours prior to the scheduled execution:

a.  The condemned prisoner will be transferred from Death Row and housed in the Death House at SOCF.  The condemned inmate will be constantly monitored by at least

DRC 1362

three (3) members of the execution team.  A log will be maintained including, but not limited to, visitors, movement, mood changes, meals served, showers, telephone calls, etc.

b.  An authorized independently licensed mental health professional will interview the prisoner periodically and submit progress reports to the Warden.  All inmate files shall be maintained in the Warden's office at SOCF.

c.  The Warden will establish a line of communication with DRC legal staff and the Attorney General's Office for notice of case status and/or other significant legal changes.

d.  The RSA will provide counseling and spiritual support unless the inmate requests not to have contact.

e.  Beginning with his arrival at SOCF, the inmate will not be forced to meet with non-staff visitors that he does not wish to see.

4.  The following events will take place upon the inmate's arrival at the Death House:

a.  Once the condemned inmate is at SOCF, the Death House will be restricted to the following:

   Director/designee(s)
   Warden
   Chief Public Information Officer(s)
   Institution Deputy Warden
   Administrative Assistant to the Warden
   Chaplain
   Physician
   Independently Licensed Mental Health Professional
   Chief of Security
   Maintenance Superintendent
   Any other person as deemed necessary by the Warden.

b.  Every possible effort shall be made to anticipate and plan for foreseeable difficulties in establishing and maintaining the intravenous (IV) lines.  The condemned prisoner shall be evaluated by appropriately trained medical staff on the day of arrival at the institution, to evaluate the prisoner's veins and plan for the insertion of the IV lines.  This evaluation shall include a "hands-on" examination as well as a review of the medical chart, to establish any unique factors which may impact the manner in which the execution team carries out the execution.  At a minimum, the inmate shall be evaluated upon arrival, later that evening at a time to be determined by the Warden, and on the following morning prior to nine a.m.  Potential problems shall be noted and discussed, and potential solutions considered, in advance of the execution.

c.  SOCF chaplains will make periodic visits to the condemned prisoner, if requested by the inmate.

DRC 1362

          

d. The Deputy Warden of Operations will assign security personnel to staff entrances, checkpoints and to assist the Ohio State Highway Patrol (OSHP).

e. The Execution Team Leader will ensure that the prisoner's property is inventoried in front of the prisoner. The condemned prisoner will have previously, per paragraph B2, specified who is to receive his or her personal effects.

f. The condemned prisoner will, per paragraph B2, specify in writing his/her request for funeral arrangements.

g. The Execution Team Leader will ask the condemned inmate to identify his or her last special meal request. The last meal will be served at approximately 4:00 p.m. the day prior to the scheduled execution.

h. The condemned prisoner will be allowed contact visits with family, friends and/or private clergy, as approved by the Warden, between the hours of 4:30 p.m. and 7:30 p.m. on the day prior to the scheduled execution. Cell front visits will be permitted between the hours of 6:30 a.m. and 8:00 a.m. on the day of the scheduled execution. The attorney and spiritual advisor may continue to visit with the condemned until 8:45 a.m. The Warden may increase the visiting opportunities at his discretion.

i. All communication equipment will be tested, including primary and secondary communication with the Governor's Office.

j. Key personnel will be briefed by the Warden, including medical and mental health, in order to allow intake information to be obtained.

k. The Warden will receive updates from security personnel and the OSHP on crowd control, demonstrations, pickets, etc.

l. The Chief of Security or designee will brief the Warden on the level of tension within the remainder of the prison population.

m. The Warden will relay any out of the ordinary activity to the South Regional Director.

n. The Execution Team will continue to prepare as needed.

o. The Warden shall consider the needs of the condemned inmate, visitors and family members, the execution team, prison staff and others, and may make alterations and adjustments to this or other policies as necessary to ensure that the completion of the execution is carried out in a humane, dignified and professional manner.

5. Approximately one (1) hour prior to the scheduled execution:

a. The prisoner will be permitted to take a shower and dress in the designated clothing for the execution.

| SUBJECT: Execution | PAGE___7___ OF __11__ |
|---|---|

b. Official witnesses to the execution will report to the institution. The victim's witnesses will report to the Portsmouth Highway Patrol Post for escort to the institution by designated SOCF personnel.

c. The RSA will be present to counsel and provide spiritual support to the inmate and staff.

6. Approximately fifteen (15) minutes prior to the scheduled execution:

a. The Warden shall read the death warrant to the condemned prisoner.
b. All authorized witness groups will be escorted to the death house separately by designated staff.

7. These procedures shall be followed concerning the medications used in the execution.

a. Upon notification to the Warden of a firm execution date, a person qualified under Ohio law to administer medications shall order a quantity of the following drugs in a timely manner from the institution's licensed pharmacist: thiopental sodium, midazolam and hydromorphone. A sufficient quantity shall be ordered as a contingency against the contamination or other inadvertent loss of any of the drugs.

b. On the day of the execution, the person qualified under Ohio law to administer medications shall take possession of the drugs thiopental sodium, midazolam and hydromorphone from the institution pharmacy, and shall document possession of the drugs by signing a receipt or log. The person qualified under Ohio law to administer medications shall deliver the drugs to the death house.

c. The person qualified under Ohio law to administer medications shall, in the presence of a second medically qualified person, give possession of the drugs to a person qualified to prepare intravenous and intramuscular injections. This transfer shall be documented by a receipt signed by these three parties. The person qualified under Ohio law to administer medications shall notify the command center upon the delivery of drugs and the command center shall log the time of delivery, the quantity, name and type of drugs delivered.

d. The drugs shall be prepared for injection by a person qualified under Ohio law to administer and prepare drugs for intravenous and intramuscular injections. The preparation of the drugs shall be monitored by a similarly qualified witness who shall independently verify the preparation and dosage of the drugs. Both medical professionals shall document and sign a written verification of the preparation and dosage of the drugs, which may be noted on the medication receipt referred to in paragraph c. above. When the drugs are prepared, the command center shall be notified and the time of the preparation recorded. The command center shall also record what drugs were prepared, the quantity, name and dosage of the prepared drugs.

e. The drugs shall be prepared as follows:

i. Five grams of thiopental sodium prepared with 25 mg/cc concentration, 40 cc per gram for a total of 200 cc which are placed in five syringes labeled "1" through

DRC 1362

"5." Five additional grams shall be obtained and kept available in the area of the execution chamber, but need not be mixed and prepared unless the primary dose of five grams proves to be insufficient for the procedure. Five additional syringes labeled "6 through "10" shall be kept available for contingent use.

ii.   10 mg of midazolam shall be obtained or prepared with 5mg/mL concentration. 40 mg of hydromorphone shall also be obtained or prepared with 10 mg/mL concentration. Drugs for intramuscular injection may be drawn up into syringes for use as needed if the decision is made to use an alternative method. The midazolam and hydromorphone in the amounts specified above shall be drawn into or mixed in a single syringe for intramuscular injection, which shall be labeled "A". A second such syringe shall be prepared if needed, and shall be labeled "B." A third syringe of 60 mg of hydromorphone only shall also be prepared if needed and labeled as "C." These syringes shall be used if the team is unable to obtain IV sites, or if an IV injection is initiated and subsequently abandoned before the procedure is concluded.

iii.   Depending upon the form and concentration of drugs delivered, it may be necessary to modify the preparation of syringes. In the event of any modification for any reason, a qualified witness shall review any modifications and the command center shall be notified and any changes recorded.

f.   The execution team shall enter the holding cell to prepare the IV sites. The member(s) of the execution team who inserts the needle and starts the intravenous connection shall be a person trained and licensed under Ohio law to administer intravenous and intramuscular medications. This team member and any others performing duties related to the administration of the drugs shall have at least one year of experience as a certified medical assistant, phlebotomist, EMT, paramedic or military corpsman. The appropriate team member(s) shall evaluate and consider the establishment of one or two viable IV sites. The team member(s) shall make such number of attempts to establish IV sites as may be reasonable under the circumstances and shall take the amount of time necessary when pursuing this objective. This step shall be accomplished in the holding cell, and the staff shall utilize heparin locks to create the sites and keep them open. The team shall test the viability of the IV site with a small amount of saline, to be flushed through the heparin lock.

g.   The arm veins near the joint between the upper and lower arm will be utilized as the preferred site for the IV injection. The team may utilize a non-invasive device such as a light, if desired, to assist in locating a vein. In the event that the execution team is unable to prepare the inmate's veins at the preferred site to receive the intravenous dose of drugs, a qualified medical person authorized to administer intravenous and intramuscular drugs may use an alternative site to deliver the drugs as they may be authorized by law.

h.   The team members who establish the IV sites shall be allowed as much time as is necessary to establish one or two viable sites. If, due to the passage of time, the difficulty of the undertaking or other reasons, the team members question the feasibility of establishing two or even one site, the team will consult with the Warden.

DRC 1362

The Warden, upon consultation with the Director and others as necessary, will make the decision whether or how long to undertake or continue efforts to establish an IV site. The Director shall also consult with legal counsel, the office of the Governor or any others as necessary to discuss the issue and alternatives.

    i.   If, after consultation, the Director and the Warden decide to proceed with an alternate method of execution, further attempts to establish an IV site may be discontinued.

8.    Execution:

    a.   The Warden and Execution Team will escort the condemned prisoner to the execution chamber, place the condemned prisoner on the lethal injection bed, secure the straps and insert the intravenous injection tubes if intravenous injection is the method used. The team shall roll up the inmate's sleeves or take other steps to ensure that the arms are plainly visible to persons in the chamber and to those in the equipment room. The Warden, Team Leader and medical team members will all confirm the visibility of the IV sites. Once the injection tubes have been connected, a low-pressure saline drip shall be connected to the IV site(s) if the method is IV administration.

    b.   Upon the prisoner's entry into the chamber, a member of the medical team in the equipment room will announce each step or action taken by any member of the medical team for the purposes of having those steps recorded in the written record.

    c.   The Warden will ask the condemned prisoner if he has any last words. If the prisoner has a last statement, he will be allowed to make it while the witnesses are present in the adjacent viewing chambers, and are able to see him and hear him via microphone. There will be no restriction on the content of the condemned prisoner's statement and no unreasonable restriction on the duration of the prisoner's last statement.

    d.   Upon the Warden's signal, the injections shall be administered in the order described above by a person qualified under Ohio law to administer intravenous and intramuscular injections. One additional person who is qualified to administer intravenous and intramuscular injections shall be present in the control room to observe the administration. The start and finish time of each syringe shall be reported to the command center and recorded in a log. If an IV injection is used, the low-pressure saline drip shall be allowed to flush saline through the line(s) following completion of the IV medication administration.

    e.   The execution team leader, the person who administers the drugs and the Warden shall observe the inmate throughout the time that the drugs are being administered to the inmate. The team leader, the drug administrator and the Warden will watch during the injection process to look for signs of swelling or infiltration at the IV site, blood in the catheter, and leakage from the lines and other unusual signs or symptoms. The person who connects the medication lines shall reenter the chamber following administration of the IV medication to inspect the IV site for evidence of incontinence or infiltration and to listen to the inmate for breathing sounds. If problems are detected during the administration of the drugs, the problem shall be corrected or the injection site changed. The medical team member who administers the drug may change IV sites whenever it appears necessary and may confer with the

Warden as desired. If it appears necessary to the Warden or the team leader that it is necessary to switch IV sites, the matter shall be communicated to the medical team member who administers the drugs.  If the drug administrator switches sites, that fact shall be announced and recorded.  In the event that the previously established IV site(s) become compromised, the team may take such time as may be necessary to establish a viable IV site or may consider the alternative method below. Whenever it is necessary to change IV sites during the execution process due to a deficiency in the initial IV site, the medication protocol and sequence must be started again.

f.  If the Director and Warden decide IV injections should not be used, or if an IV injection is commenced and abandoned, the alternative method of conducting the execution may be used.

i.  A medical team member shall enter the chamber at the direction of the Warden and shall administer an intramuscular injection of 10 mg midazolam and 40 mg hydromorphone, labeled syringe "A," into a large muscle of the condemned prisoner, usually the deltoid or triceps muscle.  Alternative sites may include the hip, thigh or other location as may be appropriate under the circumstances.

ii.  Five minutes after injection of this medication, a medical team member shall re-enter the chamber to listen for breathing sounds.  If the inmate is still breathing, the medical team member shall administer an intramuscular injection of 10 mg midazolam and 40 mg hydromorphone, labeled syringe "B," into a large muscle.

iii.  Five minutes after injection of this medication, a medical team member shall re-enter the chamber to listen for breathing sounds.  If the inmate is still breathing, the medical team member shall administer an intramuscular injection of 60 mg of hydromorphone only, labeled syringe "C," into a large muscle.

iv.  Any additional doses shall be administered as described for syringe "C."

g.  At the completion of the lethal injection process and after a sufficient time for death to have occurred, the curtain will be closed and an appropriate medical professional will evaluate the offender to confirm the fact of his or her death.  The curtain will then be re-opened and the Warden will announce the time of death.

9.  Post-Execution:

a.  The Warden, or his designee, will notify the Director that the execution has been carried out.

b.  The RSA or the inmate's Spiritual Advisor will anoint the body of the inmate if requested by the inmate.

c.  The RSA will coordinate the burial of the inmate's body with local chaplains if the inmate's family does not want the body.

d.  The Execution Team will remove the deceased from the execution bed and place him or her on a gurney.

DRC 1362

| SUBJECT:  Execution | PAGE___11___ OF __11__ |
| --- | --- |

        e.   Disposition of the body will be in accordance with arrangements made prior to the execution at the prisoner's request.

        f.   The Warden will sign and return the death warrant to the court, indicating the execution has been carried out.

        g.   One member of the medical team shall properly dispose of any unused medications while another medical team member witnesses. Both medical team members shall record the disposal or return of unused medications in an incident report, which shall be submitted to the Team Leader.

10.   Debriefing:

        a.   The Warden will ensure that critical incident debriefings are available for the Execution Team and staff participants immediately following the execution.

        b.   The critical incident debriefing team will conduct interview in accordance with CIM guidelines.

        c.   The RSA will be available for debriefing for the staff and the family of the inmate

**Related Department Forms:**

Execution Information Release          DRC1808

DRC 1362

# Informal Complaint Resolution

Institution: *OSP*

*Top section to be completed by inmate, within 14 days of incident.*

*Inmate will forward the White & Canary copies to the **supervisor** of the staff person or department most responsible for complaint;  Forward Pink copy to the **Inspector**; and keep the Goldenrod copy.*

| Submitted To: *UM JOHNSON* | | Date Submitted: *4.1.10* |
|---|---|---|
| Inmate's Name: *Dixon* | Number: *207889* | Housing Assignment *D5-28* |

Complaint Regarding: LETHAL INJECTION

1 Ohio's Director of Rehabilitation and Correction, in conjunction with Warden Phillip Kerns and incoming Warden Donald Morgan and others plan to use the November 30, 2009 lethal injection policy, DRC Policy 01-COM-11 to execute me. DRC Policy 01-COM-11 includes intravenous injection of five grams of sodium thiopental, and/or an intramuscular injection of 40 milligrams of hydromorphone and 10 milligrams of midazolam. Sodium thiopental and hydromorphone are controlled substances under the federal Controlled Substances Act, 21 U.S.C. §§ 801, et seq., and the Food, Drug & Cosmetic Act, 21 U.S.C. §§ 301, et seq., and thus these drugs may only be obtained, administered, dispensed, distributed, and/or injected by a licensed medical doctor, pursuant to a valid written, individualized prescription for these drugs. DRC does not follow these federal laws in administering its lethal injection policy. Also, none of these drugs have been approved for use in lethal injection execution, which is also a violation of these federal drug control laws. Accordingly, DRC and individuals under its employ and/or control plan to execute me in violation of the Controlled Substances Act and the Food, Drug & Cosmetic Act, and thereby also in violation of the Supremacy Clause Of the United States Constitution. In addition, Title 18, Section 241 of the United States Code (18 U.S.C. 241) "Conspiracy against the Rights of Citizens" protects a person against a conspiracy of 2 or more persons to injure, oppress, threaten or intimidate any citizen to the detriment of any Constitutional right. Under Title 18, Section 242 (18 U.S.C. 242), "Deprivation of Rights", I am entitled to be protected from discrimination, or the current Lethal Injection Protocol of Ohio, designed to inflict serious, tortuous, internal injuries to me as a person of color, an African-American, given an illegal and unjust death sentence. Before proceeding with any more lethal injection executions, DRC must comply with these federal statutes, including obtaining FDA approval for the use in executions of all chemicals to which either or all of these statutes apply.

---

*Lower Section to be completed by the supervisor of the staff person or department most responsible for complaint.*
*Return Canary copy to inmate within 7 calendar days.  Send White copy to the Inspector.*

**Action Taken** (*Cite appropriate policy, procedure or regulation in response*):



EXHIBIT
B

| Staff Member's Signature and Title: | Date: |
|---|---|

*Complaints not resolved may be addressed in accordance with 5120-9-31.*

DRC4151 (Rev 11/01)                                                                                    ACA 4271

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

EARL RINGO, JR., JOHN CHARLES )
MIDDLETON, RUSSELL E. (RUSTY) )
BUCKLEW, JOHN WINFIELD, DENNIS )
J. SKILLICORN, )
) Case No. 09-4095-CV-C-NKL
        Plaintiffs, )
)
        v. )
)
GEORGE A. LOMBARDI, STEVE )
LARKINS, JOHN DOES 2-40, )
)
        Defendants.

**EXHIBIT C**

## ORDER

Plaintiffs Earl Ringo, Jr., John Charles Middleton, Russell Bucklew, John Winfield,

and Dennis Skillicorn filed this action seeking a declaratory judgment that Missouri's lethal

injection protocol violates the Food, Drug and Cosmetic Act, 21 U.S.C. §§ 801, *et seq.*

("FDCA"), as well as the Controlled Substances Act, 21 U.S.C. §§ 301, *et seq.* ("CSA").

Plaintiff Dennis Skillicorn is deceased, having been executed by lethal injection in 2009; the

surviving Plaintiffs are prisoners of the State of Missouri sentenced to death.  They name the

following Defendants: Director of Missouri's Department of Corrections, George Lombardi;

Warden, Eastern Reception Diagnostic & Correctional Center, Steve Larkins; and

Anonymous Executioner, John Does 2-40.  In essence, Plaintiffs assert that Defendants' use

of lethal injection drugs (sodium thiopental, pancuronium bromide, and potassium chloride):

(1) violates the CSA in that Defendants do not obtain the drugs lawfully; and (2) violates the

FDCA in that the drugs are not prescribed by a licensed practitioner and have not been approved by the FDA for use in lethal injections. Pending before the Court is Defendants' Amended Motion to Dismiss [Doc. # 29]. For the reasons stated below, the Court denies the motion.

I.     **Background**[1]

    A.     **The Parties**

Plaintiffs are death row inmates in Missouri state penitentiaries. Defendant Lombardi is the Director of the Department of Corrections for Missouri; as such, he is authorized to determine how the Department of Corrections of the State of Missouri carries out lethal injections. *See* Mo. Rev. Stat. § 546.720. Defendant Steve Larkins serves as Warden of the Eastern Reception Diagnostic and Correctional Center (ERDCC) in Bonne Terre, Missouri, where Missouri conducts its executions. Plaintiffs state that they are unable to provide names for the John Doe Defendants because Missouri statute forbids the release of names and identities of those on the execution team. *See* Mo. Rev. Stat. § 546.270.2.

    B.     **The CSA and FDCA**

The CSA classifies controlled substances into "schedules" and specifies how substances in each schedule may be distributed and regulated. 21 U.S.C. § 812. The CSA requires a medical practitioner to write a prescription for substances classified under "Schedule III" before that substance may be dispensed. 21 U.S.C. §§ 829(b), 842; *see also*

---

[1] For purposes of this motion to dismiss, the Court assumes true the factual allegations of Plaintiffs' Complaint.

2

21 C.F.R. § 1308.13(c)(1)(iii). The CSA classifies sodium thiopental as a Schedule III drug. 21 U.S.C. § 829; *see also* 21 C.F.R. § 1308.13(c)(1)(iii).

The FDCA requires that "drugs" be dispensed only by a medical practitioner where they are not safe to use except under the supervision of a licensed practitioner. 21 U.S.C. § 353. The FDCA also requires that drugs be approved by the Food and Drug Administration ("FDA") before they are administered, and proven effective for their intended purpose. 21 U.S.C. § 355. The FDCA provides that all proceedings to enforce or restrain violations shall be brought in the name of the United States or states. 21 U.S.C. § 337. Other than in prohibiting declaratory judgment suits regarding generic drugs, 21 U.S.C. §§ 355(c)(3)(D)(i)(I), (j)(5)(C)(i)(I), the statute does not expressly prohibit declaratory judgment actions. The parties do not appear to dispute that the FDCA prohibits obtaining pancuronium bromide and potassium chloride without a prescription; they also do not appear to dispute that the lethal injection chemicals have not been authorized by the FDCA for use in lethal injection.

The statutes have certain exemptions for certain types and uses of drugs by certain people. For example, the CSA allows agents of registered persons to dispense drugs, 21 C.F.R. §§ 1301.22(a), (b); it allows state officers enforcing controlled substance laws to possess such substances in the course of their duties, 21 C.F.R. §§ 1301.24(a)(1), (a)(2). The parties appear to agree that the CSA, FDCA, and their corresponding regulations do not provide exceptions to their requirements for purposes of lethal injection executions.

C.    **Missouri's Lethal Injection Statute and Protocol**

3

Missouri's lethal injection statute prescribes "lethal injection" or "lethal gas" as acceptable methods of execution. Mo. Rev. Stat. § 546.720. The statute does not dictate particularities like types of personnel or chemicals to be used in carrying out different aspects of the executions.

According to the Complaint – and as Defendants appear to concede – Missouri's protocol for lethal injection executions does set forth particularities, but does not set forth procedures which require compliance with the CSA and FDCA. Missouri's lethal injection protocol is not statutory – it is issued by the Department of Corrections and sets out technical procedures for carrying out lethal injections, and it is exempt from Missouri's typical notice and comment rulemaking requirements. *Middleton v. Missouri Dep't of Corr.*, 278 S.W.3d 193, 195-96 (Mo.), *cert. denied*, 129 S. Ct. 2430 (2009). The protocol does not require the lethal injection chemicals to be prescribed or dispensed by a medical practitioner; and those chemicals have not been approved for use in lethal injections. Defendants intend to execute Plaintiffs using the lethal injection chemicals under the protocol; a doctor will not be obtaining, prescribing or administering those chemicals.

The parties appear to agree that the intended use of thiopental in the lethal injection protocol is to render a prisoner unconscious so that the prisoner does not suffer pain in the administration of pancuronium bromide and potassium chloride.

4

**D.     Exhaustion of Administrative Remedies**

According to the Complaint, to the extent they were required to do so, Plaintiffs have exhausted their administrative remedies with regard to their claims.  They filed grievances with the Missouri Department of Corrections alleging their claims concerning the CSA and FDCA, requesting that the department comply with the statutes before proceeding with executions by lethal injections.  The department issued an "Appeal Response" asserting that it is not subject to the statutes because its use of the chemicals is not a threat to public health and safety.  *See generally Bowling v. Haas*, No. 07-CV-07-KKC, 2007 WL 403875, at *3 (E.D. Ky. Jan. 31, 2007) (dismissing declaratory judgment claims that Kentucky's lethal injection protocol violated the CSA and FDCA for failure to exhaust administrative remedies).

**E.     The Complaint**

Plaintiffs assert that this Court has jurisdiction under:  21 U.S.C. § 322, granting district courts jurisdiction to restrain violations of the FDCA; 28 U.S.C. § 1331, in that it arises under the laws of the United States; 28 U.S.C., § 1651, the All Writs Act; and 28 U.S.C. § 2201(a), in that the purpose of this action is to secure declaratory relief.  Plaintiffs appear to concede that the CSA and FDCA provide no private right of action for enforcement.  *See Merrell Dow Pharmaceuticals v. Thompson*, 478 U.S. 804, 817 (1986) (stating that there is no private cause of action for violation of the FDCA).  Plaintiffs clarify that they do not seek to force the FDA nor do they seek to have a United States governmental

5

agency or official enforce the CSA or FDCA.  Instead, Plaintiffs seek merely a declaration that Defendants' intended actions as applied to Plaintiffs would violate the CSA and FDCA.

## I.    Discussion

### A.    Standing

Defendants move under Rule 12(b)(1) of the Federal Rules of Civil Procedure to dismiss Plaintiffs' claims for lack of standing.  Where a plaintiff lacks standing, a district court has no subject matter jurisdiction. *Faibisch v. University of Minn.*, 304 F.3d 797, 801 (8th Cir. 2002).  To have standing to bring a declaratory judgment action, Plaintiffs must show a personal injury which would likely be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Defendants argue that Plaintiffs cannot meet this test.

Defendants focus their standing argument on redressability: they state that a favorable declaration would not benefit Plaintiffs.  The Declaratory Judgment Act allows courts to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  *Franklin v. Massachusetts* demonstrates that suits for declaratory relief against government officials are appropriate even where other relief is not available, because it can be presumed that those officials will behave in compliance with a court's interpretation of a statute – even where injunctive relief is not available. *See* 505 U.S. 788, 803 (1992).  In Franklin, a divided Court considered the challenge of Massachusetts and two of its voters to Congress's reapportionment of seats in the House of Representatives as unconstitutional and inconsistent

6

with the Administrative Procedures Act. *See id.* at 796. The plurality found that plaintiffs had standing to seek a declaratory judgment, even if injunctive relief was not available, because it could be assumed that it was "substantially likely" that executive and Congressional officials "would abide by an authoritative interpretation of the ... statute and constitutional provision by the District Court, even though they would not be directly bound by such a determination." *Id.* at 803.

The plurality opinion was adopted by six Justices in another apportionment case, *Utah v. Evans. See* 536 U.S. 452, 462-64 (2002). In that case, the Court emphasized that steps could be taken to bring the apportionment process in compliance with a favorable declaratory judgment. *See id.* at 462.

*Franklin* and its progeny indicate that a complete remedy need not be absolutely certain. In *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC)*, a group of fishermen and boaters brought a citizens' suit for violations of the Clean Water Act by a holder of a pollution discharge certificate. 528 U.S. 167, 185 (2000). The Court found the plaintiffs' alleged injuries – river pollution – redressable through the remedy of civil financial penalties paid to the government; although the penalties would not necessarily stop the pollution, the Court found it likely to deter future violations. *Id.* at 184-85. The *Friends of the Earth* Court acknowledged that there may be a "vanishing point," at which claimed relief becomes so insubstantial or remote that it cannot support standing. *Id.* at 186 ("Judgment on the deterrent effect of the various weapons in the armory of the law can lay little claim to scientific basis." (quoting *Tigner v. Texas*, 310 U.S. 141, 148 (1940)). *See also Made in the*

7

*U.S.A. Found. v. United States*, 242 F.3d 1300 (11th Cir. 2001) (finding standing in a challenge to the constitutionality of the North American Free Trade Agreement, finding that the plaintiffs' alleged labor-market-related injuries were sufficiently redressable via an injunction or declaration against subordinate officials in the executive branch, even if other countries might not comply so as to give the plaintiffs full relief). Defendants do not offer a basis upon which to distinguish *Franklin*.

Here, Plaintiffs' standing is not undermined to the vanishing point by the possibility that Defendants would ignore a declaration that the CSA and FDCA apply to Missouri's lethal injection protocol. Under *Franklin*, the Court may presume that Defendants would seek to comply with those statutes should they be declared applicable to lethal injections. A suggestion that compliance is likely appears in *Brown v. Vail*, a suit for declaratory and injunctive relief challenging the state of Washington's lethal injection protocol as violating federal controlled substance regulations, among other laws; there, Washington's assistant secretary of health services for the state's department of corrections had resigned over – among other issues – concerns about obtaining lethal injection chemicals for executions in violation of federal law. 623 F. Supp. 2d 1241, 1247 (W.D. Wash. 2009) (abstaining based on the presence of a parallel state lawsuit). A declaratory judgment that Defendants are violating the CSA and FDCA would make it likely that Defendants would stop any such violations. *See also Banks v. Secretary of Indiana Fam. & Soc. Servs. Admin.*, 997 F.2d 231, 241 (7th Cir. 1993) (presuming that a state Medicaid agency would abide by the court's authoritative construction of federal Medicaid regulations).

8

In addition to challenging redressability, Defendants seem to argue that Plaintiffs lack standing because they are not claiming to suffer a personal injury.   Defendants say that Plaintiffs want a declaration of the legal relationship between the Missouri Department of Corrections, its employees and the federal government.   According to Defendants, "the only persons that are at possible risk" of noncompliance with the CSA and FDCA are Defendants – by way of federal criminal penalties.   [Doc. # 56 at 3.]

The Court touched on the harm that would be suffered by violations of the CSA and FDCA in ruling on Plaintiff Skillicorn's emergency motion for a stay of execution, filed within days of his execution date.   *See Ringo v. Lombardi*, No. 09-4095-CV-C-NKL, 2008 WL 1406980 (W.D. Mo. May 19, 2009).   In that motion, Plaintiffs argued that they would suffer if not assured the protections of the statutes.   *See id.* at *3.   In balancing this alleged harm with Missouri's significant interest in prompt execution and other factors relevant to examination of a late-filed motion for a stay of execution, the Court found that the alleged harm did not – for purposes of that motion – warrant a stay.   *See id.*

On Defendants' motion to dismiss, the Court must assume true Plaintiffs' allegations concerning their threatened injury.   *See Lujan*, 503 U.S. at 561.   A fair reading of the Complaint indicates that Plaintiffs seek to redress the risk of inhumane lethal injection by clarifying that the precautions required by the CSA and FDCA apply.   If the CSA and FDCA apply, they provide safeguards against improper use of lethal injection chemicals by assuring that medical practitioners are adequately involved in the use of those chemicals.   If the statutes apply to lethal injection, ignoring those safeguards, as Plaintiffs allege Defendants

9

intend to do, places Plaintiffs at risk.  Thus, to the extent Plaintiffs seek a declaration that the statutes' safeguards apply to lethal injection, they seek a declaration of their own rights. Plaintiffs have standing to bring this declaratory action.[2]

**B.    Substantive Claims**

Defendants also move under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss for failure to state a claim upon which relief can be granted.  To survive such a motion, the Complaint must state a claim that is plausible on its face.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  According to the Complaint, Missouri's lethal injection protocol does not comply with the CSA and FDCA.  Defendants do not appear to dispute this.  The parties appear to agree that the plain language of the statutes contains no exception for lethal injection protocols.  What the parties dispute is whether the requirements of the CSA and FDCA extend to lethal injections.

**1.    Congressional and Executive Inaction**

Both parties argue that Congressional inaction in this field weighs in their favor with regard to whether the statutes apply.  They say that Congress has not issued exceptions to the CSA and FDCA for lethal injection purposes, despite the attention lethal injection litigation has received.  Plaintiffs say this means that there is no exception to the statutes for use of the

_____

[2] Defendants do not appear to argue that Plaintiffs cannot show that their claimed injury is traceable to Defendants' alleged misconduct. *Cf. Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156-57 (10th Cir. 2005) (finding that an abortion provider did not have standing to challenge a state statute making providers responsible for certain costs associated with performing abortions without parental consent; the alleged harm – losing some minor patients – could not be shown to be traceable to enforcement officials' conduct, as opposed to the providers' independent decision to demand parental consent from all minor patients).

10

chemicals in lethal injections. Defendants say this means the statutes do not apply to them;
Defendants further argue that the lack of FDA enforcement action or criminal prosecution
for use of the chemicals in lethal injections indicates that the statutes do not apply to them.

"[W]e walk on quicksand when we try to find in the absence of corrective legislation
a controlling legal principle." *Helvering v. Hallock*, 309 U.S. 106, 121 (1940) (quoted in
*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 186-87
(1994)). Of course, there are likely many reasons for Congressional and executive inaction
with regard to lethal injection protocols, including a desire to avoid the politics of execution.
Congressional and executive inaction do not warrant granting Defendants' motion to dismiss.
*See generally United States v. Marshall*, 998 F.2d 634, 636, n. 4 (8th Cir. 1993) ("[W]e do
not discount the force of inertia in governmental affairs.").

### 2.    Accepting Jurisdiction in the Absence of Action

The decision of whether to accept jurisdiction is within the Court's discretion. *Wilton
v. Seven Falls Co.*, 515 U.S. 277, 282 (1995). The key questions in deciding whether to
exercise jurisdiction are whether a judgment would serve to clarify and settle the legal
relations at issue, and whether a judgment would afford relief from uncertainty and
controversy giving rise to the proceedings. *See Alsager v. District Ct. of Polk County*, 518
F. 2d 1160, 1163-64 (8th Cir. 1975).

Defendants argue that *Heckler v. Chaney* dictates that the Court should not exercise
its jurisdiction over Plaintiffs' declaratory judgment claims. *Heckler* held that an express
FDA decision, in response to citizen requests, not to take enforcement action regarding lethal

11

injection chemicals was not reviewable under the Administrative Procedures Act. *See* 470 U.S. 821, 838 (1985) (affirming a district court's refusal to compel the FDA to investigate and enforce the allegedly illegal use of lethal injection drugs after the FDA had expressly refused to do so; stating that the FDA's refusal was discretionary and not subject to judicial review).

Courts have distinguished *Heckler* in cases challenging general enforcement policies, as opposed to express administrative decisions.  In *Roane v. Holder*, the plaintiffs sought relief from federal officials' alleged general policy of failing to enforce the CSA against those who participated in federal executions.  607 F. Supp. 2d 216, 219 (D.D.C. 2009).  The *Roane* court found that *Heckler* does not mandate dismissal of an Administrative Procedures Act challenge to the Drug Enforcement Administration's alleged general policy – divorced from any particular factual scenario – of not enforcing the CSA as to lethal injection.  *Id.* at 226-27 (citing *Crowley Carribean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994), as suggesting that *Heckler* indicates that general policy statements, as opposed to individual enforcement decisions such as those addressed in *Heckler*, "may be reviewable for legal sufficiency where the agency has expressed the policy as a formal regulation after the full rulemaking process ... or has otherwise articulated it in some form of universal policy statement[.]").  The *Roane* court allowed the case to continue to the extent the plaintiffs were claiming that the DEA had made a general statement of enforcement of the CSA concerning federal lethal injections, and to the extent they were claiming that the protocol was illegal in that it failed to require registration.  *Id.* at 227.

12

Here, as in *Roane*, Plaintiffs do not challenge a particular express decision not to enforce the CSA and FDCA against Defendants.  Instead, they seek a declaration that applying the Missouri protocol to them would be illegal because the protocol fails to meet the requirements of those statutes.  Plaintiffs seek only a general declaratory judgment – a declaration that would apparently not run against a stated federal agency's policy much less its application of such a policy to a fact-specific scenario.  *Heckler* does not preclude the exercise of jurisdiction in such cases.

As to whether the Court should accept jurisdiction over this declaratory judgment action, *Franklin* indicates that it should.  A declaratory judgment in this case would serve to clarify and settle Defendants' legal obligations with regard to the CSA and FDCA.  It would also be likely to afford relief for both parties from the uncertainty and controversy giving rise to the proceedings. As in *Evans*, at this stage of the litigation, it appears that there may be steps Defendants could take to bring the protocol in compliance with the relevant statutes. Thus, the exercise of jurisdiction under 28 U.S.C. § 2201(a) is appropriate.

## C.    Preemption

Defendants argue that the CSA and FDCA do not preempt Missouri's lethal injection statutes or regulations. They argue that the FDCA and CSA were not intended to address lethal injection protocols and thus cannot "preempt" those protocols.  Defendants note that Congress -- as well as other federal agencies -- did not intend to bar states from regulating controlled substances and has not prohibited states from carrying out lethal injections with

the drugs used by Missouri and the federal government. Thus, they seem to conclude that Missouri is allowed to use a lethal injection protocol which violates the FDCA and CSA.

Where, as here, there is no express preemption, state law is only preempted by federal law to the extent that it actually conflicts with federal law, such that compliance with both state and federal law is impossible or state law is an obstacle to the accomplishment of Congressional objectives. *Lankford v. Sherman*, 451 F.3d 496, 510 (8th Cir. 2006). Defendants do not cite to a state statute or regulation that prescribes a particular manner of lethal injection. Missouri's lethal injection protocol is not statutory – it is issued by the Department of Corrections; it is exempt from Missouri's typical notice and comment rulemaking requirements. *Middleton v. Missouri Dep't of Corr.*, 278 S.W.3d 193, 195-96 (Mo.), *cert. denied*, 129 S. Ct. 2430 (2009). Missouri's lethal injection statute prescribes only "lethal injection" or "lethal gas" as acceptable methods of execution. Mo. Rev. Stat. § 546.720.

Construing Plaintiffs' Complaint favorably, there is presumably a way to use these methods that does not violate the FDCA and CSA. At this stage of the litigation, there is no indication that either the protocol or statute precludes compliance with the CSA and FDCA such that all cannot coexist. Here, the question is whether Defendants are violating federal law, not whether that federal law preempts a contrary Missouri law. It is plausible that Defendants could bring Missouri's lethal injection protocol in line with the FDCA and CSA without contradicting Missouri law. To the extent that could not be accomplished, preemption analysis would be appropriate. Thus, the Missouri lethal injection statute is

14

unlike the statute at issue in *State v. Deputy*, which considered whether the FDCA and CSA preempted a state statute expressly providing that lethal injection was not a medical procedure and expressly allowing any pharmacist to dispense the chemicals without a prescription; the *Deputy* court found no preemption. 644 A. 2d 411, 417-19 (Del. Super. 1994). Without details on Missouri's lethal injection protocol, it is too soon to know the extent to which the relevant statutes and protocol can coexist, and the extent to which any preemption has occurred. On Defendants' motion to dismiss, a showing by Plaintiffs that there is a preemption is unnecessary at this stage of the litigation.

The Court also addressed preemption in its Order on Plaintiff Skillicorn's motion for a stay execution. *See Ringo*, 2008 WL 1406980 at *3. The arguments raised by the parties in that emergency motion, fully briefed within three-days of filing the Complaint, demonstrated that Plaintiff Skillicorn could not meet the standards for success on the merits for several reasons, including that he could not show a likelihood of success on the merits which included a showing of preemption. *See id.* (citing *Delaware v. Deputy*, 644 A.2d 411 (Del. Super. Ct. 1994)). To clarify, to succeed on the merits, Plaintiffs need to either show preemption <u>or</u> that Defendants can carry out executions in compliance with the CSA, FDCA, and Missouri law at the same time. Plaintiff Skillicorn showed neither under the standards applicable to a motion for stay of execution. But under the standards applicable to a motion to dismiss, Plaintiffs need not show a likelihood of success on the merits; rather, they need only state a claim plausible on its face.

### 1.   Statutory Purposes

15

Apparently to facilitate their preemption analysis, Defendants argue that the CSA and FDCA do not apply here because they were not intended to address lethal injection situations. Contrary to Defendants' assertions, applying the FDCA and CSA in this case appears to be consistent with their purposes.

The two statutes generally insure careful handling of drugs. One of the FDCA's core objectives is to ensure that drugs are both "safe" and "effective" for their intended use. *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Defendants concede that the purpose of the FDCA is to protect the public by limiting the use of dangerous drugs to medically supervised situations.

The general purpose of the CSA is to deal with drug abuse in a comprehensive fashion, H.R. Rep. No. 91-144, 1970 U.S.C.C.A.N. 4566, 4567. The purpose of the particular provision on which Plaintiffs rely, 21 U.S.C. § 829(b), is to ensure that patients use controlled substances under doctors' supervision to prevent abuse and bar doctors from peddling to patients who abuse the substances. *Gonzales v. Oregon*, 546 U.S. 243, 274 (2006).

According to Defendants, these concerns are irrelevant in the case of prisoners sentenced to death. "Safety, measured as the lack of adverse effects on a person, is not at issue in an execution." [Doc. # 29 at 18-19.] Defendants say that thiopental cannot be abused because it results in death. [Doc. # 29 at 18, Doc. # 38 at 6.]

Defendants' position poses an interesting contrast to the Supreme Court's recent statement in *Baze v. Rees*, 128 S. Ct. 1520, 1533 (2008). Considering death row inmates'

16

declaratory judgment challenge to Kentucky's lethal injection protocol under the Eighth

Amendment, the *Baze* Court stated: "It is uncontested that, failing a proper dose of sodium

thiopental that would render the prisoner unconscious, there is a substantial, constitutionally

unacceptable risk of suffocation from the administration of pancuronium bromide and pain

from the injection of potassium chloride." This statement was echoed by the Eighth Circuit

in *Taylor v. Crawford* when considering whether Missouri's lethal injection protocol violated

the Eighth Amendment:

> The evidence reveals that the only inherent risk in Missouri's written procedure arises
> from the specific chemicals chosen by the State to carry out the sentence of death by
> lethal injection. Lethal injection itself is commonly thought to be the most humane
> form of execution. . . . There is no dispute, however, that the third and last chemical
> chosen for use in this protocol will cause excruciating pain if the inmate is not
> adequately anesthetized and that use of the second chemical in the sequence will
> simultaneously mask any visible sign of that pain.

487 F.3d 1072, 1082 (8th Cir. 2007), *cert. denied*, 128 S. Ct. 2047 (2008). In *Taylor*, the

Eighth Circuit found persuasive the involvement of medical personnel and rules for

administering the chemicals in the lethal injection protocol in holding that the protocol did

not give rise to an Eighth Amendment violation as cruel and unusual punishment. *Id.* at

1083-84. Plaintiffs point out that the Department of Corrections argued before the Eighth

Circuit in its appellate brief in *Taylor*, 2006 WL 3857886, that thiopental was used for the

medical purpose of rendering the prisoner unconscious "so that the execution is humane."

Where the Eighth Amendment requires protocols that include adequate safeguards against

unnecessary pain, *see Taylor*, 487 F.3d at 1084, and superior courts have indicated that the

involvement of medical professionals and rules for administration enhances such safeguards,

17

the safeguards provided by the CSA and FDCA are not irrelevant.  At least at this stage of litigation, Plaintiffs' claims do not appear to run contrary to the purposes of the CSA and FDCA.

### D.   Res Judicata

Citing to matters outside the Complaint, Defendants also assert in their Rule 12(b)(6) motion that Plaintiffs' claims are barred by the doctrine of res judicata.  Res judicata applies where a prior judgment involves the same cause of action and the same parties or their privies. *Wedow v. City of Kansas City, Mo.*, 442 F.3d 661, 669 (8th Cir. 2006).  Specifically, Defendants argue that a recent judgment on the pleadings in *Clemons v. Crawford* precludes Plaintiffs' claims. *See* No. 07-4129-CV-C-FJG, 2008 WL 2783233 (W.D. Mo. July 15, 2008), *affirmed*, 585 F.3d 1119 (8th Cir. 2009).  Plaintiffs here were denied leave to intervene in *Clemons, see id.* at *2; Defendants – apparently not named in *Clemons* – make no argument that they are in privity with the *Clemons* defendants.  In *Clemons*, the plaintiffs challenged the constitutionality of Missouri's lethal injection protocol, alleging that Missouri's past failure to select and train qualified lethal injection personnel put the plaintiffs at risk of unconstitutional pain and suffering in the course of their executions; the *Clemons* court found that the plaintiffs' claim was not viable under *Baze* and *Taylor. See id.* at *1-2.  Here, Plaintiffs seek a declaration that Missouri's execution protocol is in violation of the FDCA and the CSA, raising questions not reached by *Baze, Taylor,* or *Clemons*.  Res judicata is an affirmative defense on which Defendants bear the burden. *See Taylor v. Sturgell*, 128 S. Ct. 2161, 2179-80 (2008).  Even if the Court were to consider the matters

18

outside the Complaint concerning res judicata on Defendants' motion to dismiss, it would find that Defendants have not carried their burden.

## II.    Conclusion

Accordingly, it is hereby ORDERED that Defendants' Motion to Dismiss [Doc. # 29] is DENIED.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  March 2, 2010
Jefferson City, Missouri

19